Elias ATTALLAH, Violeta Lajam de Attallah, and the Conjugal Partnership They Comprise, Plaintiffs, Appellants,

v.

UNITED STATES of America, Defendant, Appellee.

No. 91–1291.

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1991.

Decided Feb. 5, 1992.

Luis A. González–Pérez, Hato Rey, P.R., for plaintiffs, appellants.

Heidi E. Weckwert, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Daniel F. López–Romo, U.S. Atty., Hato Rey, P.R., and Phyllis J. Pyles, Asst. Director, Torts Branch, Civil Div., Washington, D.C., were on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, COFFIN and TIMBERS,* Senior Circuit Judges.

* Of the Second Circuit, sitting by designation.

TORRUELLA, Circuit Judge.

This appeal arises from an action brought by Elias Attallah and Violeta Lajam de Attallah against the United States Customs Service, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, seeking to recover damages for the theft of their property. The United States District Court for the District of Puerto Rico entered summary judgment for defendants. We affirm.

## I. FACTS

We review the facts as ascertained by the district court. Elias Attallah and Violeta Lajam Attallah (hereinafter "plaintiffs") allege that on or about September 10, 1982, a courier named Yamil A. Mitri–Lajam transported currency and other monetary assets into the Commonwealth of Puerto Rico on their behalf. These assets were owned by plaintiffs and valued at $693,838.43. Upon arrival at Luis Muñoz Marin International Airport, Mitri–Lajam declared and surrendered the assets for verification to the U.S. Customs Service agents ("Customs agents" or "agents") on duty, as required by federal law. The courier was to enter the country and deposit the assets at the San Juan branch of the Royal Bank of Canada. When plaintiffs did not hear from Mitri–Lajam that day, they contacted the bank and were told that the courier had not arrived. Plaintiffs then contacted the Customs Service and were told, by a person who identified himself as a Customs agent, that Mitri–Lajam had been processed by customs and had left the premises. Elias Attallah travelled to Puerto Rico the evening of September 10, 1982, and went to the Customs Service office the next day. After being told the same information, he contacted the Puerto Rico Police Department.

Approximately ten days later, Mitri–Lajam's decomposed body was found in Puerto Rico's rain forest—El Yunque. The police advised Mr. Attallah that they had no leads as to who was responsible for the criminal acts committed.

On May 13, 1987, four years and seven months later, a federal grand jury returned an indictment against two former Customs agents—Rafael J. Dominguez and Daniel J. Maravilla—for the assault, robbery, and murder of Mitri–Lajam. The indictment was the conclusion of a federal investigation into the death of Mitri–Lajam, and it included charges of obstruction of justice, perjury and unlawful transportation of stolen assets in interstate commerce.

In June 1987, Elias Attallah was approached by the U.S. Justice Department to testify for the prosecution in the criminal trial against the two former Customs agents Domínguez and Maravilla. On January 12, 1988, the Customs Service received a letter from plaintiffs claiming damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.* for the negligent conduct of Domínguez and Maravilla, who allegedly acted within the scope of their employment.[1] The instant complaint against the United States was filed on October 3, 1988.

Plaintiffs also allege that Customs agents Rafael J. Domínguez, Daniel J. Maravilla, Julio C. Palmer, and other unidentified agents designated as John, Richard and William Doe, negligently failed to provide adequate security for the assets which were stolen or lost while under the exclusive custody and control of the Customs agents; and that Customs agents Maravilla and Domínguez willfully assaulted, robbed and murdered Mitri–Lajam.[2] Plaintiffs

---

1. Plaintiffs filed an initial complaint against the United States and the Customs Service on June 29, 1988. However, that complaint was dismissed without prejudice on the sole ground that plaintiffs had failed to exhaust their administrative remedies inasmuch as their suit was filed prematurely. Section 2675(a) of the FTCA provides that an agency has six months in which to dispose of an administrative claim. If after that six-month period the agency has not

acted upon the claim, then the claimant may file a lawsuit in district court.

2. Following a federal investigation, Domínguez and Maravilla were indicted for these crimes. After a jury trial, the former Customs agents were convicted of murdering Mitri–Lajam, among other crimes. *González–Bernal v. United States,* 907 F.2d 246, 248 (1st Cir.1990) (wrongful death suit brought by the wife and children

further allege that the Customs Service negligently supervised the aforementioned agents, and fraudulently concealed the two agents' involvement in the disappearance of the assets.

On February 2, 1991, the district court entered summary judgment for defendant on the grounds that plaintiff's first claim arose out of the intentional criminal acts committed by two Customs agents acting outside the scope of their employment. Furthermore, the district court held that plaintiff's second and third claims were barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). A timely Notice of Appeal was filed on March 11, 1991. As we agree with the district court's reasoning, we affirm.

## II. STANDARD OF REVIEW

Summary judgment is proper when there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[3] We consider the undisputed facts in the light most favorable to the non-movant. *See, e.g., Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804 (1st Cir.1987). Our review of legal issues is plenary.

## III. LEGAL ANALYSIS

### A. Accrual of Action

■ The FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.,* affords a plaintiff two years from the date a claim against the United States accrues, to file a written claim with the agency thereby preserving the right to file a tort suit in federal court against the United States. 28 U.S.C. § 2401(b).[4] It is well settled law that an action brought against the United States under the FTCA must be dismissed if a plaintiff has failed to file a timely administrative claim with the appropriate federal agency. *United States v. Kubrick,* 444 U.S. 111, 113, 100 S.Ct. 352, 355, 62 L.Ed.2d 259 (1979); *González–Bernal v. United States,* 907 F.2d 246, 248 (1st Cir.1990). *See also, Vega–Vélez v. United States,* 800 F.2d 288 (1st Cir.1986); *Richman v. United States,* 709 F.2d 122 (1st Cir.1983). The filing of a timely administrative claim is a jurisdictional requirement that cannot be waived. *González–Bernal,* 907 F.2d at 248; *Richman,* 709 F.2d at 124. If the claimant fails to comply with this requirement, his claim is "forever barred." 28 U.S.C. § 2401(b).

■ Plaintiffs-appellants allege that appellees deliberately concealed material facts related to Mitri–Lajam's death, and thus, that the statute of limitations should not begin to run until they discovered, or by reasonable diligence should have discovered, the basis of the lawsuit.[5] They argue that even in the exercise of due diligence they could not have discovered that Customs agents were the responsible parties within two years of Mitri–Lajam's death, and that the statute of limitations should begin to run at the time of the indictment of the responsible Customs agents. The general rule, within the meaning of the FTCA, is that a tort claim accrues at the time of the plaintiff's injury, *Kubrick,* 444 U.S. at 120, 100 S.Ct. at 358; *González–Bernal,* 907 F.2d at 249; *Richman,* 709 F.2d at 123—in this case, at the time of the courier's robbery, on or about September

of courier Mitri–Lajam against the United States and the Customs Service).

**3.** Although defendant's motion was brought under Rule 12(b)(6), it was treated as a motion for summary judgment by the district court. *See Attallah v. United States,* 758 F.Supp. 81 (D.P.R. 1991). Since the plaintiffs have not objected, we assume the propriety of the district court's action.

**4.** Title 28 U.S.C. § 2401(b) provides:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

**5.** Plaintiffs contend that the federal government fraudulently concealed the critical facts relating to the former Customs agents' involvement in the disappearance of the assets. Because the court has found that plaintiffs' action is timely we do not address this issue. *But see González–Bernal,* 907 F.2d at 250 ("[T]he government is under no obligation to provide private citizens with information concerning ongoing criminal investigations").

10, 1982. Plaintiffs filed their claim with the Customs Service on January 12, 1988, five years and four months after the robbery and assassination of their courier, Mitri–Lajam. Hence, according to the statute of limitations provision cited above, the plaintiffs' action is time-barred.

■■■ However, the jurisprudence has recognized an exception to the general rule established by the statute of limitations in actions which fall under the so-called "discovery rule." *See, e.g., Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Under the discovery rule, the action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action. *Kubrick,* 444 U.S. at 121–25, 100 S.Ct. at 359–61; *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 130 (1st Cir.1987). The standard set forth by the discovery rule is an objective one. In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been "inherently unknowable" at the time of the injury. *See, e.g., Levin v. Berley,* 728 F.2d 551, 553 (1st Cir.1984). After a careful examination of the record in the light most favorable to plaintiffs, we find that the principles established by the discovery rule warrant a delayed accrual in this case since appellants did not know, nor in the exercise of reasonable diligence could have known of the Customs agents' criminal acts until the time of their indictment in May of 1987.

The government, however, argues that the statute of limitations should not be tolled in this case because appellants were aware of their injury and its cause on or about September 20, 1982, when the body of the courier was found.[6] At that time, the government claims, appellants were armed with the critical facts concerning

their injury, i.e., loss of their assets, and its cause—the abduction and murder of Mitri–Lajam. We disagree. Appellants travelled to Puerto Rico when their courier failed to call them after his trip. They visited the Customs Service office at the Luis Muñoz Marin airport where they were told that Mitri–Lajam had been processed and had left the premises. In fact, they were even shown documentation to that effect. Aside from this information, appellants had no other source of information regarding the whereabouts of their courier. In light of these facts, we cannot see how appellants could have known the factual basis for their claim—the robbery and subsequent assassination of their courier by two Customs agents. The police did not have sufficient information to bring charges against the responsible Customs agents until 1987. We believe appellants could not have been more efficient. Where the injury and its cause are not immediately apparent, accrual of the cause of action occurs at the time the injury is discovered or when a claimant in exercise of reasonable diligence could have discovered it. *Kubrick,* 444 U.S. at 121–25, 100 S.Ct. at 359–61. Therefore, appellants cause of action accrued on or about June 1987, when criminal indictments were brought against the responsible parties, and since plaintiffs presented their claim to the Customs Service on January 12, 1988, we find their court action is timely.

**B. Scope of Employment**

■■ Notwithstanding the timeliness of appellant's claim, we find that appellant's cause of action is barred on different grounds. Appellants contend that the Customs agents who committed the criminal acts against their courier, and their property, on or about September 10, 1982, were acting within the scope of their employ-

---

**6.** The government relies on this court's decision in *González–Bernal, supra,* to argue that appellant's cause of action arose on or about September 10, 1982. However, this court's decision in that case had nothing to do with the accrual issue presented here. There we held that plaintiff González–Bernal failed to bring a court action within the prescribed six months, after their claim before the Customs Service was de-

nied. *González–Bernal,* 907 F.2d at 249, 251 (citing 28 U.S.C. § 2401(b) in its holding). If a plaintiff does not bring a court action within the six months following the denial of a claim before a federal agency, then they are forever barred from bringing a court action based on the same facts. *See* 28 U.S.C. § 2401(b). A factual determination as to when the cause of action arose was never made in that case.

ment, and thus liability lies on the part of the United States. We find appellant's proposition flawed.

The United States is only liable for "loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment....*" 28 U.S.C. § 1346(b) (emphasis supplied). Whether or not a government employee's act is within the scope of his/her office or employment "is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred." *Borrego v. United States,* 790 F.2d 5, 6 (1st Cir.1986) (citing *Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); *Merritt v. United States,* 332 F.2d 397 (1st Cir.1964)). The acts upon which the present action is based took place in the Commonwealth of Puerto Rico. An examination of Puerto Rico case law pertaining to whether an employees' action is or is not within the scope of his/her employment supports the conclusion reached by the district court in this case— that the Customs agents responsible for the criminal acts against Mitri–Lajam were not acting within the scope of their employment.

■ According to the Puerto Rico Supreme Court in *Rivera, et al v. Maldonado, et al,* 72 D.P.R. 479 (1951), the fact that the employee is under the general employment of the employer does not necessarily create an inference that a particular act by the employee was within the scope of his employment. *Rivera,* 72 D.P.R. at 484 (our translation). Rather,

"[t]o consider the act to be within the scope of his employment, it should be the kind of act that the employee would be called upon to perform in his job, and it should have occurred during a period not unreasonably disconnected with the period of employment, and in a place not unreasonably distant from the place of employment, and *motivated, at least in part, with the purpose of serving his employer.*

*Id.* (emphasis added) (our translation).[7] The Court expanded this standard in *Pérez Rodríguez v. Saurí,* 84 D.P.R. 500, (1962), stating that "in order for liability to lie on the part of the employer, regardless of whether the employee's actions were against the employer's instructions or exceeded the duties of his employment, *said act must have had the intention of benefitting the employer or forwarding his/her interests.*" *Pérez Rodríguez,* 84 D.P.R. at 503–04 (emphasis added) (our translation).[8]

■ Furthermore, the Puerto Rico Supreme Court has ruled that "an employer is not liable for the wrongful criminal and intentional acts of an employee, unless this conduct is due somehow to the employee's desire to serve, benefit or further his employer's business or interest." *Jiménez v. The People of Puerto Rico,* 83 P.R.R. 195, 200–01 (1961).[9] According to the Court in *Jiménez,* "the test of liability is whether notwithstanding the fact that it is a question of wrongful conduct, the act performed is reasonably related to the scope of the employment, or if the agent has been prompted by purely personal motives." *Jiménez,* 83 P.R.R. at 201.[10] Es-

**7.** *See also Martínez v. U.S. Casualty Co.,* 79 D.P.R. 596, 601 (1956); *Lloréns v. Lozada,* 73 D.P.R. 271, 275–77 (1952); *Maysonet v. Sucn. Arcelay,* 70 D.P.R. 167, 171–73 (1949); *Suárez v. Saavedra,* 60 D.P.R. 605, 609–11 (1942).

**8.** *See also Vargas Vargas v. Belthor Cáceres Corp.,* 90 D.P.R. 37, 41–42 (1964).

**9.** In *Jiménez* a state policeman—who was on duty and in uniform—had an argument with a citizen and, thereafter, followed him home and fatally shot him. The decedent was not committing any crime, nor otherwise acting in a manner which should have provoked such a

response from the officer in his official capacity. Therefore, the Puerto Rican Supreme Court found no liability on the part of the police department. In other words, the policeman was engaged in a personal venture of his own, rather than doing something in promotion of his employer's interests.

**10.** Citing *González v. Compañía Agrícola,* 76 P.R.R. 373 (1954) (the essential point is to determine the agent's intention in performing such act and, if in performing it his intention was to serve and protect the interests of the employer and not his own, liability shall be imposed on the employer). *See also Rubén Martínez v. Co-*

sentially, there must be some link between the intentional criminal act committed by the employee, and the legitimate interests of the employer.

█ Thus, when determining whether or not an employee acted within the scope of his/her employment, the following elements must be evaluated:

1. Desire to serve, benefit, or further his/her employer's business or interest.
2. That the act is reasonably related to the scope of the employment.
3. That the agent has not been prompted by purely personal motives.

*Borrego,* 790 F.2d at 7 (citing *Rodriguez v. United States,* 328 F.Supp. 1389, 1391 (D.P.R.1971)).

We can only conclude that, as a matter of law, the criminal conduct at issue in the instant case was not within the scope of the actors' employment—all three elements of the standard are absent in this case. Here, two Customs agents assaulted, robbed and then murdered a person—appellant's courier, Mitri–Lajam. We fail to see how these horrendous actions could have in any way been intended to benefit, or forward the interests of their employer, the United States Customs Service. Nor were the agents' actions related to their employment. The agents' duties were limited to checking passengers' luggage for property which might be subject to duty upon entrance to the United States, or which might have been introduced into the country contrary to law. 19 U.S.C. § 482. Needless to say, assault, robbery and murder are clearly not part of the duties of Customs agents. No other conclusion can be reached but that the agents acted purely out of their own personal interests, and not the government's, and carried out intentional criminal acts, responsibility for which can only be attributed to them. We simply cannot impose liability on the United States for actions taken by their employees outside the scope of their employment.

C. Discretionary Function Exception

 Appellants further assert that the United States is liable for the conduct of the other Customs agents, aside from

Maravilla and Domínguez, on duty the day Mitri–Lajam arrived in Puerto Rico. They argue that if said agents had carried out their duties properly and checked Mitri–Lajam when he came through their checkpoint they would have been able to uncover the malicious intentions of Maravilla and Domínguez, and warned Mitri–Lajam as to the danger nearing him. Unfortunately for plaintiffs, while said agents were clearly acting within the scope of their employment at the time Mitri–Lajam was processed by the Customs Service, their duties fall under the discretionary function exception of the Federal Tort Claims Act. 28 U.S.C. § 2680(a). Because the FTCA discretionary function exception is a limitation on the waiver of sovereign immunity, cases which fall within the exception must be dismissed for lack of subject matter jurisdiction. *Irving v. United States,* 909 F.2d 598, 600 (1st Cir.1990) (citing 28 U.S.C. §§ 1346(b), 2680(a); *Wright v. United States,* 719 F.2d 1032, 1034 (9th Cir.1983); *Baird v. United States,* 653 F.2d 437, 440 (10th Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982)). We explain below.

The FTCA is a broad waiver of sovereign immunity, granting district courts jurisdiction to hear tort suits against the United States for damages caused by its employees acting within the scope of their employment, where the United States, if a private party, would be liable under the law of the place where the tort occurred. 28 U.S.C. §§ 2674, 1346(b). However, 28 U.S.C. § 2680 establishes fourteen exceptions to 28 U.S.C. § 1346(b). Among the fourteen statutory exceptions to this waiver of immunity is 28 U.S.C. § 2680(a) which exempts

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee

*munidad Mateo Fajardo Cardona,* 90 P.R.R. 451, 455–56 (1964).

of the Government, whether or not the discretion involved be abused.

Section 2680 "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Irving*, 909 F.2d at 600 (citing *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984)). Because § 2680(a) is a limitation on the waiver of sovereign immunity, cases which fall within the discretionary function exception must be necessarily dismissed, as a matter of law, for lack of subject matter jurisdiction.

 The Supreme Court has provided some guidelines to determine whether or not a particular governmental function is discretionary and would come under the discretionary function exemption to the FTCA. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764.[11] The Supreme Court has made clear that the exception does not preclude liability for any and all acts arising out of the regulatory programs of federal agencies. *Berkovitz v. United States*, 486 U.S. 531, 538, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). Rather, the inquiry focuses on the permissible range of action available to the government employee allegedly at fault. "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee." *Id.* at 536, 108 S.Ct. at 1958. "[I]f the act simply does not involve

the exercise of [policy] judgment," *Id.* at 546–47, 108 S.Ct. at 1964, or if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," § 2680(a) does not apply.[12] *Id.* at 536, 108 S.Ct. at 1958. The exception will apply, however, where there is room for choice, and where that permissible choice is "based on considerations of public policy." *Id.* at 537, 108 S.Ct. at 1959.

The Supreme Court has further dictated that, even when the challenged action is the product of an employee's permissible use of judgment, a suit is barred only if that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536–37, 108 S.Ct. at 1959 (quoting *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765).

Thus, here we must examine the nature of the responsibilities of the Customs agents on duty, other than Domínguez and Maravilla, at the time Mitri–Lajam was processed. Section 482 of Title 19 of the United States Code, the Tariff Act, provides that Customs officers "... *may stop, search and examine,* ... any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law...." (emphasis added). Title 19 U.S.C. § 1582 provides that "all persons coming into the United

---

**11.** *Varig Airlines* involved two lawsuits challenging the Federal Aviation Administration's certification for commercial use of two airplanes which later caught fire in flight. The Court held that the discretionary function exception applied because the two challenged agency actions—the FAA's general decision to spot-check airplane manufacturers' self-inspections rather than fully inspecting every plane, and the spot-check inspectors' specific decisions to certify the two airplanes as safe—were taken within a statutory and regulatory milieu leaving both the agency and its spot-check inspectors room to

make policy decisions. *Varig Airlines*, 467 U.S. at 819–20, 104 S.Ct. at 2767–68.

**12.** The Court held that the exception did not apply in *Berkovitz*—a suit challenging the government's licensing of a vaccine lab, and the Food and Drug Administration's approval of a specific batch of vaccine made at that lab—at least insofar as the plaintiff's complaint alleged that the government employees had failed to follow mandatory statutory statutes, regulations, or agency policy which did not allow for employee choices grounded in policy. *Berkovitz*, 486 U.S. at 539–48, 108 S.Ct. at 1960–65.

States from foreign countries shall be liable to detention and search by authorized officers or agents...." Section 162.6 of the Code of Federal Regulations, which implements said statute provides that: "All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof *are liable to inspection and search by a Customs officer.... if such action is deemed necessary or appropriate.*" (emphasis added). Section 162.7 of the same Code of Federal Regulations states: "A Customs officer *may stop, search, and examine any vehicle, person, or beast,* or search any trunk or envelope wherever found, in accordance with section 3061 of the Revised Statutes (19 U.S.C. 482)." (emphasis added).

■■■ The language of the statute, as well as that of the regulations, grants Customs agents the authority to stop a particular passenger and search him/her for property which may be subject to duty upon entrance to the United States, or which may have been introduced into the country contrary to law. However, according to the statute and regulations, the agents are not obligated to stop and search every passenger. This function, we believe, is a discretionary function as defined by § 2680 of Title 28 of the United States Code. The words "may stop, search and examine," and "are liable to inspection," indicate to us that there is room for choice on the part of Customs agents when carrying out their duties. This authority to discriminate among passengers is exactly the type of discretionary function that section 2680(a) sought to protect from liability. Whether or not an agent searches a particular passenger is a function which requires the exercise of judgment. The decision an agent makes is of great importance in ful-

filling the mandate of the Customs Service—to protect the integrity of our national borders. *See, e.g., U.S. v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *U.S. v. 1903 Obscene Magazines,* 907 F.2d 1338 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 518, 112 L.Ed.2d 529 (1990). It is imperative that a Customs agent feel at liberty to exercise his/her discretion to search, or not, any passenger, without fearing legal repercussions. For these same reasons, standards for searches and seizures by Customs agents at the border (Customs agents need not show probable cause in order to carry out a search at the border) are less stringent than at any other place in our nation. *United States v. Montoya de Hernández,* 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985); *Ramsey,* 431 U.S. at 616–17, 97 S.Ct. at 1978–79. Thus, we hold that section 2680(a) insulates the Government from liability grounded on the performance of a discretionary function by a Customs agent.[13] Said section constitutes a limitation on the subject matter jurisdiction of federal courts, and, as a matter of law, requires us to affirm the district court's judgment.

■■■ Appellants further allege that the customs agents on duty the day Mitri–Lajam was processed failed to properly supervise agents Maravilla and Domínguez, thus facilitating their criminal actions against Mitri–Lajam. However, how, and to what extent the Customs Service supervises its employees certainly involves a degree of discretion and policy considerations of the kind that Congress sought to protect through the discretionary function exception.[14] *See United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 1279, 113 L.Ed.2d 335 (1991). (If the routine or frequent

---

**13.** It should be noted that where the government is performing a discretionary function, the fact that the discretion is exercised in a negligent manner does not make the discretionary function exception to the FTCA inapplicable. *Dalehite v. United States,* 346 U.S. 15, 33, 73 S.Ct. 956, 966, 97 L.Ed. 1427 (1952); *Berkovitz,* 486 U.S. at 539, 108 S.Ct. at 1960; *In re Agent Orange Product Liability Litigation,* 818 F.2d 210 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988).

**14.** *See, e.g., Slagle v. United States,* 612 F.2d 1157, 1161 (9th Cir.1980) (supervision of a police informant was a discretionary function); *Goodwill Industries of El Paso v. United States,* 218 F.2d 270, 272 (5th Cir.1954) (supervision of migratory workers was a discretionary function).

nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the exception, then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable. This is not the rule of our cases.); *Ortiz v. United States,* 661 F.2d 826, 831 (10th Cir.1981) (inspection-supervisory activity in the construction (or repair) of a home is part of an official's discretionary function). This circuit has held that the Air Force's supervision of an unrecognized student organization involved in an R.O.T.C. program was a discretionary function and, hence, barred a Federal Tort Claims Act wrongful death suit arising out of a hazing incident, where Air Force memoranda indicated that decisions about supervising the organization implemented policy choices. *Mercado del Valle v. United States,* 856 F.2d 406 (1st Cir.1988). Moreover, the Sixth Circuit held that the Army's decision as to how it should supervise new recruits awaiting enlistment was discretionary. Hence, a passerby injured when recruits threw furniture out a window could not recover for negligent supervision. *Carlyle v. United States Department of the Army,* 674 F.2d 554 (6th Cir.1982). Certainly then, in this case, the supervisory functions of the Customs Service constitute discretionary functions as defined by 28 U.S.C. § 2680(a). For the same reasons that Customs agents are granted more liberties when conducting searches at the border, *see Montoya, supra,* their supervisors must also be free to make discretionary decisions as to how closely, and in what

manner they will supervise Customs agents. We thus, hold that this claim is barred by the discretionary exception to the FTCA. 28 U.S.C. § 2680(a).

 Last, appellants argue that the failure of the Customs Service to properly carry out its policies concerning security aided the commission of the crime which led to the loss of their property, and therefore, the Government should be held liable. But as discussed above, whether or not an agency like the Customs Service, provides any security for the property it takes under its custody, and what policies said agency adopts, as well as, how its agents choose to implement said policies constitute discretionary functions as defined by § 2680(a). The Customs Service has no obligation under its enabling statute to provide any security for passengers, or their property. *Marbley v. United States,* 620 F.Supp. 811, 813 (D.C.D.C.1985); *Haygan v. United States,* 627 F.Supp. 749, 750–51 (D.D.C. 1986). To get around this hurdle appellants suggest that once the agency has established security measures to insure the safety of the property they take into custody, it is the obligation of Customs agents to follow these policies. However, appellants cite no policies or regulations, and we were unable to find any, which indicate an obligation on the part of Customs agents to take any security measures in regards to property which is processed by Customs.[15] Moreover, it should be noted that in the present case no property was taken into custody. Since there was no mandatory Customs Service regulation providing any security measures for property which

---

**15.** Appellants argue that the reason they did not cite any policies regarding the provision of security by Customs agents to property was that the district court stopped discovery before they could conduct depositions of the agents on duty at the time that Mitri–Lajam was processed. They sustain that the decision of the district court amounts to reversible error. We disagree. The regulations which govern the Customs Service can be found in Title 19 of the Code of Federal Regulations, a publication which could have been easily attainable by appellants in any law library.

Moreover, assuming for the sake of argument that such a policy exists, the First Circuit's decision in *Zabala Clemente v. United States,* 567 F.2d 1140 (1st Cir.1978), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978), estab-

lishes that "even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability." *Zabala Clemente,* 567 F.2d at 1149. To the extent plaintiffs attempt to rely solely upon a federal internal policy directive as a source of a duty owed to the plaintiffs in the instant case, *Clemente* provides that violation of such a policy cannot provide the basis for suit under the Federal Tort Claims Act. *See also Fazi v. United States,* 935 F.2d 535, 539–40 (2d Cir.1991); *Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1156 (D.C.Cir.1985); *Tuepker v. Farmers Home Admin.,* 708 F.2d 1329, 1333 (8th Cir.1983).

# 786

comes through Customs, but is not taken into custody, no liability can be found on the part of the Government.[16]

We find appellant's reliance on two Puerto Rico cases, *Negrón v. Orozco, et al.,* 113 D.P.R. 712 (1983), and *Hernández v. ELA,* 116 D.P.R. 293 (1985), to prove liability on the part of the government misplaced. Both cases are easily distinguishable from the present case. We first point out that neither case involved a claim under the Federal Tort Claims Act against the United States. Certain exceptions exist to the waiver of immunity by the United States which might not be applicable when a plaintiff is suing a state.[17] Moreover, the case before us now is not a case where the government is involved in regulating private conduct and protecting the public from danger. Rather, we are dealing with the loss of property which was processed by the Customs Service, an agency whose purpose is to collect duties, and protect the borders of the United States from contraband. Indeed, Customs agents are not "guardians of public peace," but have duties and powers limited to the type described in the enabling statute of the Customs Service. *United States v. Jackson,* 423 F.2d 506, 508 (9th Cir.), *cert. denied,* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970).

We hold that the district court was correct in finding that, as a matter of law, the present suit is barred by Title 28 § 2680(a).

*Affirmed.*

---

16. We wish to add that if the property had in fact been lost while under the custody of the Customs Service, and then appellants had brought an action, said action would have been barred by § 2680(c), which bars

[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by any officer of customs or excise or any other law enforcement officer.

17. In *Orozco,* the Puerto Rico Supreme Court held that the state was held responsible for failing to disarm a police officer who had been involved in an argument with another person,

and subsequently fatally shot that person while both individuals were in the police department. In that case the negligent actors were police officers with a duty to protect the safety of the public, especially individuals under their custody. In *Hernández,* the Supreme Court of Puerto Rico held that the Superintendent of Police of Puerto Rico was liable to an individual who was hurt by a member of the police force who shot him with his police-issued gun—where the member was under psychiatric care, and the police psychiatrist had recommended to the superintendent that his gun be taken away, but he failed to do so.